UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JEFFREY WALSTON; JACQUELINE WALSTON; JOHN DANIELS; PAULA DANIELS; and KRISTI KOKES IRA,[1]

Plaintiffs/Garnishors,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation and a member company of American International Group, Inc.,

Defendant/Garnishee.

Case No.: 3:09-CV-122-AC

OPINION AND ORDER

CONSOLIDATED CASES:

Case No.: 3:10-CV-579-AC
Case No.: 3:10-CV-6126-AC

---

BASIN SUPERIOR INVESTMENTS, LLC; JIE LIU; LAN CHEN; DOUGLAS

[1]The court has included in the caption only those plaintiffs currently before the court and affected by this Opinion and Order, not those remanded to state court or never removed to this court.

HAMBLEY; CHARLING HAMBLEY;
DAVID McKENZIE; HEIDI McKENZIE;
KEITH J. MILLER; SANDY MILLER;
LYNN OSBORN; KATHERINE OSBORN;
POLARIS INVESTMENTS, LLC; ROBERT
THIBEDEAU; BRUCE VAN ETTEN;
ESTATE OF MELBOURNE YATES;
and SHIRLEY YATES;

Plaintiffs/Garnishors,

v.

JOSEPH A. LaCOSTE; JOENE LaCOSTE;
ANGELA McCOY; ANTHONY TUOMI;
PETER MARTIN; MARTIN CO., INC.;
TIMOTHY D. SMITH; ANDREW J. BEAN;
WEATHERFORD THOMPSON COWGILL
BLACK & SCHULTZ, PC; WILLIAM C.
DUVAL; DUVAL BUSINESS LAW, PC;
STATE FARM INVESTMENT
MANAGEMENT CORP.; and STATE FARM
VP MANAGEMENT CORP.,

Defendants,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

Garnishee.

---

JEFFREY WALSTON; JACQUELINE
WALSTON; JOHN DANIELS; PAULA
DANIELS; and KRISTI KOKES IRA,

Plaintiffs/Garnishors,

v.

JOSEPH A. LACOSTE; CRAIG E. SWEET; WALTER LUDTKE; ANGELA McCOY; PETER MARTIN; THE MARTIN COMPANY; TIM SMITH; LUNA YAN; ANTHONY TUOMI; WILLAM C. DUVAL; WEATHERFORD THOMPSON COWGILL BLACK & SCHULTZ, PC; SANTA CLARA HOMES, LLC; NEWPROT BRIDGE VIEW, LLC; 21st AVENUE, LLC; FISHERMAN'S WHARF, LLC; GIBSON HILL ESTATES, LLC; WILLAMETTE VILLAGE BUSINESS CENTER, LLC; WISTERIA ESTATES, LLC; STRAWBERRY FIELDS, LLC; STOLTZ HILL ESTATES, LLC; McMINNVILLE CORNERS, LLC; NORTH POINT ESTATES, LLC; WILLAMETTE DEVELOPMENT SERVICES, LLC; STATE FARM INVESTMENT MANAGEMENT CORP.; and STATE FARM VP MANAGEMENT CORP.,

Defendants,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,

Garnishee.

---

ACOSTA, Magistrate Judge:

*Introduction*

These three consolidated actions represent an attempt to garnish the proceeds of an Insurance Agents' Professional Liability Policy issued by National Union Fire Insurance Company of Pittsburgh, PA, ("National Union") to State Farm Insurance Companies ("State Farm") insuring, among others, State Farm agent Angela M.. McCoy ("McCoy") for the period from January 1, 2008,

to January 1, 2009 ( the "Policy"). The plaintiffs here are garnishors (collectively referred to as "Garnishors") in two state actions filed against McCoy seeking damages as a result of investments involving Willamette Development Services, LLC ("Willamette"). *Jeffrey Walston v. Joseph A. LaCoste*, Linn County Circuit Court Case No. 081802, filed June 13, 2008 (the "*Walston* state action"), and *Pamela Alford et al. v. Joseph A. LaCoste, et al*, Multnomah County Circuit Court Case No. 0806-09101, filed June 24, 2008 (the "*Alford* state action").

Currently before the court is the motion for summary judgment filed by National Union in the consolidated cases. National Union argues McCoy's conduct and the Garnishors' claims are not covered under the terms of the Policy. National Union asserts the Policy insured McCoy only when she was acting as an agent of State Farm, that McCoy's conduct falls with the exclusions for intentional conduct or commingling, and that a number of Garnishors have failed to establish a causal connection between their investments and McCoy's conduct.

*Preliminary Procedural Matters*

I. Magistrate Judge's Authority

A magistrate judge's authority is limited to the handling of pretrial matters pending before the court. 28 U.S.C. § 636(b)(1)(A) (2011). A magistrate judge may also handle dispositive matters, such as motions for summary judgment, but must submit proposed findings of fact and recommendation to an Article III for review. 28 U.S.C. § 636(b)(1)(B). However,

> Upon consent of the parties, a full-time United States magistrate . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves.

Consequently, a magistrate judge has jurisdiction over an action only if the parties have consented to it. Parties to an action generally must give such consent explicitly, and in writing. *Columbia Record Productions v. Hot Wax Records, Inc.*, 966 F.2d 515, 516-17 (9th Cir. 1992).

The parties in this garnishment action are the Garnishors and National Union. These parties have executed and filed written consents to a magistrate. McCoy, identified as the "Debtor" in the writs of garnishment, and the defendants in the *Watson* and *Alford* state actions have not consented. However, McCoy, who was originally the plaintiff in the case filed in this court against National Union, represented to the court on March 31, 2011, that she did not intend to pursue the action and did not oppose consolidation of her action with any related cases then pending before the court. As a result, McCoy was terminated as a party in this case in April 2011.

The Eight Circuit addressed the issue of who must consent to a magistrate judge in a garnishment proceeding and held that because the judgment debtor was not a party to a garnishment proceeding under state law, his consent was not required to vest the magistrate judge with jurisdiction. *Giove v. Stanko*, 882 F.2d 1316, 1318 (8th Cir. 1989). The court explained that under state law, any person who claims ownership in property sought to be garnished had the right to intervene in the garnishment action, and that failure to do so deprives the person of the right to be a party and participate in the action. *Id.* The Ninth Circuit relied on *Giove* in finding that a property owner's standing to contest forfeiture or garnishments actions is conditioned on strict filing requirements. *United States v. Real Property*, 135 F.3d 1312, 1316 (9th Cir. 1998). Because the property owner failed to comply with the applicable filing requirements in responding a civil forfeiture complaint, he lacked standing as a party to the action which made it unnecessary to obtain his consent to the magistrate judge's jurisdiction. *Id.* at 1317. *See also United States v.*

*Montgomery*, No. CV-03-1853-PHX-LOA, 2008 WL 659804 (D. Ariz. Mar. 6, 2008)(judgment debtor who failed to file objection to writ of garnishment is not party to action and need not contest for magistrate judge to have jurisdiction).

Neither McCoy or the defendants in the *Walston* and *Alford* state actions have filed objections or intervened in this garnishment proceeding. Accordingly, they are not parties to this action and their consent is not needed before magistrate judge jurisdiction over this action may vest. Because the parties to this action, Garnishors and National Union, have consented to a magistrate judge, the court proceeds under 28 U.S.C. § 636(c) and will issue an Opinion and Order, not a Findings and Recommendation.

II. Motion to Strike Declarations

National Union moves to strike as irrelevant the declarations of Jaysen Daskalos and Froydis Tyburczy offered by Garnishors in their opposition pleadings. Neither Daskalos or Tyburczy are parties to this action. Both were named as plaintiffs in the *Alford* state action. Daskalos's writ of garnishment was removed to this court and then remanded back to state court. Tyburczy's writ of garnishment, if any was filed, was never removed to this court.

The declarations offered by Garnishors describe the interactions between the declarants and McCoy. Tyburczy recalls an investor meeting at which McCoy spoke about ways to invest which would avoid, or minimize, tax liability and that McCoy offered State Farm materials at the meeting. (Tyburczy Decl. ¶¶ 2, 5.) McCoy gave Tyburczy her State Farm business card and offered further assistance regarding the topics she had discussed. (Tyburczy Decl. ¶¶ 2-3.) Tyburczy understood that McCoy was offering her investment advisory services. (Tyburczy Decl. ¶ 4.) Daskalos testified that he met with McCoy at her State Farm office seeking assistance with his retirement account.

(Daskalos Decl. ¶ 2.) Daskalos purchased various State Farm products from McCoy and, on her advice, directed that $50,000 be invested in a Willamette property. (Daskalos Decl. ¶¶ 2-3.) McCoy informed Daskalos that the Willamette investment was separate from State Farm and not a State Farm product. (Daskalos Decl. ¶ 2.)

National Union argues that the evidence offered in these declarations is irrelevant because neither declarant is a party to this action. Evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c)(4) (2011). The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401 (2011).

The evidence of McCoy's interactions and relationships with nonparties is not relevant to the issue before the court, which is whether the damages awarded the Garnishors in the limited judgments based on alleged negligent conduct of McCoy which induced the Garnishors to invest in Willamette are covered by the Policy. None of the Garnishors have indicated that they attended the investor meeting that Tyburczy described, received business cards from McCoy, or were specifically offered investment advisory services. Accordingly, the information contained in the Tyburczy declaration does not speak to the relationship between McCoy and the Garnishors or the information McCoy provided the Garnishors. Similarly, Daskalos describes private interactions he had with McCoy and decisions he made based on these interactions. There is no evidence that any of Garnishors were present or aware of the representations McCoy made to Daskalos during these private meetings. Consequently, none of the Garnishors could have relied on this information in

deciding to invest in Willamette. National Union's motion to strike these declarations is granted. The court will not consider the information contained in the declarations in evaluating National Union's pending motion for summary judgment.

*Background*

During the period relevant to these actions, McCoy was certified by State Farm to sell State Farm variable products and securities; State Farm bank products, such as certificates of deposits, money market accounts, mortgages and auto loans; and State Farm insurance products, including life, health, and automobile insurance. (Bruett Decl. ¶ 2.) On July 10, 2006, McCoy expanded her responsibilities with State Farm and executed an Investment Adviser Representative Agreement (the "IAR Agreement") in which she agreed to provide Advisory Services exclusively through State Farm to State Farm's existing and prospective clients. (Meiwes Decl. Ex. 2 at 1-2.) "Advisory Services" was described in the State Farm Financial Services Brochure (the "Brochure") as the "develop[ment of] customized financial plans that address the specific needs and financial circumstances of each individual client" which "are intended to constitute general investment information and education, not individualized investment advice." (Meiwes Supp. Decl. Ex. 1 at 3.)

On January 10, 2007, McCoy completed a form advising State Farm that she was engaging in "Other Outside Business Activities." (Meiwes Decl. Ex. 3.) McCoy indicated that as of January, 2007, she was working sixty-four hours per month for, and receiving a salary from, Willamette. (Meiwes Decl. Ex. 3 at 1-2.) McCoy represented that: 1) she was serving as "Director of Investor Relations Managers Department"; 2) the department was "responsible for securing loans for development projects via private placement memorandums"; and 3) the customers of Willamette were not customers who had purchased State Farm securities products. (Meiwes Decl. Ex. 3 at 2.)

In response to concerns that McCoy's involvement with Willamette, and specifically her representation that she would be involved in securing loans for development projects, would result in a conflict with State Farm products, Joyce Meiwes, State Farm Field Compliance Officer, requested clarification from McCoy on her role with Willamette. (Meiwes Decl. ¶ 3.) McCoy told Meiwes that Willamette was a real estate development company started by her brother, Joseph LaCoste, who was looking for investors to fund building projects. (Meiwes Decl. ¶ 3.) McCoy indicated that she would be working behind the scenes getting investor files in order and that she would have no contact with prospective investors. (Meiwes Decl. ¶ 3.) She also assured Meiwes that no securities were involved. (Meiwes Decl. ¶ 3.)

Brooks Bruett, State Farm Agency Field Executive, also questioned McCoy about her outside business activities form. (Bruett Decl. ¶ 4.) McCoy explained that her brother was just starting Willamette and that she was helping him with back office administrative tasks, such as creating and organizing a computer filing system for his investors, but would have no contact or communication with potential investors. (Bruett Decl. ¶ 4.) McCoy represented that she was being paid for her time but would not receive commissions and had no ownership interest in Willamette. (Bruett Decl. ¶ 4.) Bruett expressed concern about the amount of time McCoy was devoting to Willamette and McCoy indicated that her role at Willamette was "temporary", which Bruett understood to mean until Willamette got up and running. (Bruett Decl. ¶ 4.) Bruett concluded that McCoy's work with Willamette would not be in conflict with State Farm products based on the temporary and administrative nature of the involvement and the absence of any contact with Willamette's investors. (Bruett Decl. ¶ 5.) Thereafter, State Farm approved McCoy's outside business activity request. (Bruett Decl. ¶ 5.)

Contrary to McCoy's representations to State Farm that her involvement with Willamette was purely administerial and that she would have no contact with investors, McCoy attended and spoke at numerous investor meetings and was identified as an owner of Willamette in at least one private placement memorandum ("PPM"). In a document entitled Investor Day Agenda, which described an event scheduled to occur on September 19, 2007, McCoy was identified as Director of Investor Relations and was to address the topics of "Not your Usual Investment – Investor Perks"; "Investor Partner Program (debt v. equity offering)"; "Tax Issues (Self-directed IRA's, Beneficiary ROTH IRA's)"; "Legal Liability issues"; and "Open Offerings review – PPM's in the back)". (Hardiman Decl. Ex. 20.) Many investors represented that McCoy was introduced as someone with experience in financial planning and investments, that she provided a generic overview of investments, and that she spoke about Willamette investment opportunities as well as investing within a Roth IRA to obtain favorable tax benefits. (Groves Dep. 17:18-19:5, 32:21-34:2; Liu Dep. 18:21-21:9; Mutschler Dep. 9:11-10:12; McNaught Dep. 20:22-22:25; Vitkauskas Dep. 14:3-15:11; Yu Dep. 10:14-11:5; Eason Dep. 18:3-19:24.) At various meetings, McCoy made estate planning brochures available which indicated on the last page that they were "Compliments of Your State Farm Agent for Auto, Life, Fire, and Health Insurance" and displayed the State Farm logo. (Liu Dep. 34:5-25, Ex. 10; Mutschler Dep. 26:13-27:21; Hambley Dep. 18:9-19.) On at least one occasion, McCoy took a check from, and closed a deal with, an investor. (Thibedeau Dep. 14:4-8.) Additionally, at least one investor had the impression that McCoy had left State Farm and started working full time for Willamette in mid-2007. (Liu Dep. 28:24-29:20.) The record reveals that at least one of the Garnishors was an existing customer of State Farm and had purchased State Farm car and health insurance from another State Farm agent. (Liu Dep. 19:15-18.)

In the Strawberry Fields PPM, McCoy was listed as the primary contact for questions related to the investment and identified as a member of Willamette's management team. (Clapham Decl. at 71, 85.) The PPM described McCoy as the "Investor Relationship Manager" and explained that:

> Angela has spent 15 years in financial services including present ownership of a local agency of a national insurance company. She is a Certified Financial Planner (CFP) holds her Chartered Financial Consultant (ChFC) designation, and is a Certified Public Accountant (CPA) as well.

(Clapham Decl. at 85.) In the resume included in the PPM, McCoy is identified as the "Director of Investor Relations" along with the titles of "Executive Entrepreneur • National Speaker Visionary Leadership • Global Expansion • Operations Management • Program Development • Project Management • Financial Planner". (Clapham Decl. at 111.) The resume describes McCoy's professional experience as follows:

> Angela has spent 15 years in the Financial Services industry. She has spent 10 years educating corporate employees and clients about their personal financial choices and strategies. Angela is a Certified Financial Plannner (CFP® ), holds her Chartered Financial Consultant (ChFC) designation, as well as, Certified Public Accountant (CPA) and Chartered Property and Casualty Underwriter (CPCU), Long Term Care Professional (LTCP) and Chartered Advisor i[n] Senior Living (CASL). She is an active member of Oregon City Chamber of Commerce, and the Society of Financial Services Professionals.
>
> Angela owns a State Farm Insurance and Financial Services Agency in the Portland area. Angela's focus is Financial & Estate planning, Insurance and Risk Management Education and Retirement Planning.
>
> Angela has a B.S. in Finance from Oregon State University and a Post-Baccalaureate in Accounting from O.S.U. She is currently completing her Master's of Science in Financial Services from the American College in Philadelphia, PA.

(Clapham Decl. at 111.)

The investment returns promised on the Willamette investments did not materialize, the real estate developments were not completed, and Willamette eventually closed its doors. In June 2008,

the investors formed two groups and filed actions in state court against McCoy and others asserting numerous claims, including violations of state securities laws. (Clapham Decl. Ex.'s 1, 2.) McCoy tendered the defense of both actions to National Union and asked to be indemnified under the Policy asserting that the investors' claims were based on actions taken in her capacity as a State Farm agent or IAR. (Clapham Decl. Ex. 5 ¶¶ 7-8.) National Union denied coverage under the Policy and McCoy filed a state court action against National Union for breach of contract, which was removed to this court in early 2009. *McCoy v. National Union*, CV No. 09-122-AC, filed January 29, 2009 (the "*McCoy* action"). (Clapham Decl. Ex. 5 ¶ 9.) In October 2009, McCoy agreed to the entry of limited judgments against her in the *Walston* and *Alford* state actions and to the assignment of her rights in the Policy and the *McCoy* action to the plaintiffs in the *Walston* and *Alford* state actions. (Clapham Decl. Ex. 12 ¶¶ 3.1-3.2.)

On January 7, 2010, the state court entered a Limited Judgment in the *Walston* state action providing that:

> plaintiffs have a limited judgement against defendant Angela McCoy for plaintiffs Eighth Claim only (negligence) in the principal amount of $1,225,200.00, plus post-judgment interest at the rate of 9% per annum commencing on the date this judgment is entered until paid, and for plaintiff's costs and disbursements incurred herein in the sum of $0 and that execution issue for these amounts.

(Clapham Decl. Ex. 10.) The Eighth Claim for Relief in the *Walston* state action alleged, in pertinent part, that:

> 74.
>
> None of the plaintiffs had any significant investment experience and the funds invested constituted virtually their entire savings. All of the plaintiffs were relying [on] the investment advi[c]e of the non-attorney defendants, particularly the investment advi[c]e of defendants McCoy . . . .

75.

The non-attorney defendants were negligent in recommending the investment in the Notes and membership interests to plaintiffs in that:

A. The commingling of the funds between the 11 LLCs increases the chances that the investor will not get repaid since the failure of a single LLC imperils all of the LLCs.

B. An unsecured loan to a new construction project is unreasonably risky and commercially unreasonable given the financial condition, sophistication, age, and employment/retirement status of the plaintiffs.

76.

The non-attorney defendants were negligent in recommending that plaintiffs borrow funds from home equity loans and other loans, in that:

A. An unsecured loan to a new construction project such as the [Willamette] projects carries great risk of non-payment while the investor will need to repay the funds borrowed to invest.

B. The ownership of a person's primary residence carries with it a homestead exemption which protects a certain amount of the value of that home from attachment by creditors but that such homeowner loses the protection of this homestead exemption if such home is used as security for a loan.

C. The commingling of the funds between the 11 LLCs increases the chances that the investor will not get repaid since the failure of a single LLC imperils all of the LLCs.

D. It is usual and customary practice to require either a mortgage or a trust deed on a borrower's property to secure a construction loan, and no such security existed for each plaintiff's construction loan to LCCs.

77.

The non-attorney defendants . . . were negligent in agreeing to permit [Willamette] to commingle the funds of the 11 LLCs.

78.

As a direct consequence of said negligence of the non-attorney defendants,

> each of the plaintiffs suffered damage in an amount to proved at trial, but no less than the amount of each plaintiff's investment into [Willamette] and the 11 LLCs, . . . ."

(Clapham Decl. Ex. 1 ¶¶ 74-78.) Similarly, on February 8, 2010, the state court entered a Limited Default Judgment against McCoy in the *Alford* state action indicating that:

> each of the plaintiffs . . . should have and recover a limited judgment against defendant Angela McCoy on their (second) claim that defendant McCoy was negligent with respect to making recommendations or otherwise rendering advice regarding securities, determining which recommendations or advice regarding securities should be given, and offering investment advisory services, and that plaintiff shall recover from defendant the amounts stated below, with prejudgment interest at the rate of 9% per annum from December 1, 2007, along with their costs and disbursements.

(Clapham Decl. Ex. 11.)

The plaintiffs in the *Walston* and *Alford* state actions filed garnishment proceedings against National Union in state court attempting to collect on the limited judgments against the Policy. National Union removed those proceedings to this court based on diversity jurisdiction. In considering a motion to remand filed by the plaintiffs in *Alford*, this court found that each writ of garnishment was a separate and discrete civil action and that it did not have diversity jurisdiction over those writs seeking less than $75,000. Accordingly, only the plaintiffs with claims greater than $75,000 were properly before this court and all other plaintiffs were remanded to state court. *Pamela Alford et al. v. Joseph A. LaCoste, et al*, CV No. 10-579-AC, Findings and Recommendation filed November 18, 2010, adopted by Judge Haggerty on January, 12, 2011. On April 26, 2011, this court dismissed McCoy as plaintiff in the *McCoy* action, substituted the Garnishors as intervenor plaintiffs in the *McCoy* action, and consolidated Garnishors' properly removed writs of garnishment from the *Walston* and *Alford* state actions into the *McCoy* action. *McCoy*, Minute Order dated April 26, 2011.

The Garnishors assert that the damages awarded in the limited judgments were based on

claims that McCoy was negligent with respect to investment advice she gave them and that McCoy's conduct falls within the terms of the Policy. Consequently, the Garnishors seek to recover the damages awarded in the *Walston* and *Alford* state actions from National Union.

The Policy generally protects State Farm agents from claims made against them from January 1, 2008, to January 1, 2009, for wrongful acts committed in the performance of their duties as agents of State Farm. (Clapham Decl. Ex. 13.) The terms of the Investment Adviser Endorsement ("Endorsement") obligate National Union:

> To pay on behalf on the Insured all sums which the Insured shall become legally obligated to pay as damages because of any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period or the Extended Reporting Period (if applicable) arising out of any actual or alleged Wrongful Act committed by the Investment Adviser Representative solely while acting in his/her capacity as such.

The Endorsement defines "Investment Adviser Representative" as:

> an individual who has met all requirements necessary to be certified as a Certified Financial Planner by the Certified Financial Planners Board of Standards, maintained proper state registration as Investment Advisor Representative, and met other requirements as established by State Farm Mutual Automobile Insurance Company or any Affiliate thereof.

(Clapham Decl. Ex. 13 at 22). The Policy definition of "Wrongful Act" includes an actual or alleged negligent act, error or omission. (Clapham Decl. Ex. 13 at 6.) The Policy specifically excludes claims alleging "fraud, dishonesty, criminal or malicious acts or omissions," those "brought about or contributed to by any commingling of funds or accounts, . . . for sums received by any Insured or credited to any Insured's account, . . . [or] for fees, premiums, taxes, commissions or brokerage monies", and those based on a "Wrongful Act committed with knowledge that it was a Wrongful Act." (Clapham Decl. Ex. 13 at 7-8.)

National Union argues that the damages awarded Garnishors under the limited judgments do not fall within the terms of the Policy as McCoy was not acting as an agent of State Farm while working for Willamette and, therefore, does not qualify as an IAR as defined in the Endorsement. Alternatively, National asserts that Garnishors' damages derive from claims that fall within the Policy exclusions for fraudulent or criminal conduct, commingling of funds, or commitment of a Wrongful Act with knowledge. Finally, National Union argues that a number of Garnishors have failed to establish that relied on McCoy's negligent statements in deciding to invest in Willamette.

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell*

*v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2010). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I. Limited Judgment Damages as Covered Loss Under the Policy

National Union asserts that the damages awarded in the limited judgments issued in the *Alford and Walston* state actions are not covered losses under the Policy. National Union argues that McCoy was not acting as an IAR, as defined in the Endorsement, at the time she was promoting and recommending Willamette as an investment to Garnishors.

To determine whether an award or judgment entered against an insured is covered by an insurance policy, a federal court sitting in diversity must interpret the language of that policy in accordance with the laws of the forum state. *Home Indem. Co. v. Stimson Lumber Co.*, 229 F. Supp. 2d 1075, 1090 n.4 (D. Or. 2001). Under Oregon law, the interpretation of plain and unambiguous

contract provisions is a question of law for the court. *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992).

The "primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties." *McLeod v. Tecorp Intern., Ltd.*, 318 Or. 208, 215 (1993), quoting *Totten v. New York Life Ins. Co.*, 298 Or. 765, 770 (1985). Contracts are construed to effectuate the objectively reasonable intentions of the parties. *Oregon School Employees Ass'n. v. Rainier School Dist. No. 13*, 311 Or. 188, 196 (1991); *Botts v. Hartford Accident & Indem. Co.*, 284 Or. 95, 101 (1978). "The parties' intention is found in the language used in the contract and the surrounding circumstances." *U.S. Nat'l. Bank of Oregon v. Caldwell*, 60 Or. App. 639, 642 (1982).

In interpreting an insurance policy, the court must first examine "the text and context of the policy as a whole, to determine whether the policy's text and context answer the question that is posed." *McLeod*, 318 Or. at 215. Unambiguous contracts must be enforced according to their terms. *Oregon School*, 311 Or. at 194. A contract provision is "unambiguous if its meaning is clear enough to preclude doubt by a reasonable person." *Quality Contractors, Inc. v Jacobsen*, 139 Or. App. 366, 371 (1996). On the other hand, a term is considered ambiguous if it has no definite meaning or is capable of more than one plausible interpretation. *Hoffman*, 313 Or. at 470. To be plausible, an interpretation must be reasonable "in light of, among other things, the particular context in which that term is used in the policy and the broader context of the policy as a whole." *Id.*

In determining whether a contract provision is ambiguous, the terms of the contract are presumed to have been incorporated and used in their primary and general meaning. OR. REV. STAT. 42.250 (2011). When a particular term is not defined in the contract, the court must begin by identifying the plain meaning of the term. *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303,

308 (1999) The court may also consider the circumstances under which the contract was made to determine the intended meaning of the term, including the situation of the subject and of the parties, "so that the judge is placed in the position of those whose language the judge is interpreting." OR. REV. STAT. 42.220 (2011); *Sunset Coatings Co. v. State ex rel. Dep't. of Transport.*, 62 Or. App. 53, 56 (1983). If two or more plausible interpretations of the disputed term still remain, the term is considered ambiguous. *Hoffman*, 313 Or. at 470. The insurer has the burden of drafting insurance policies that are clear and unambiguous. *North Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29 (2001). Therefore, any ambiguity in an insurance policy should be strictly construed against the insurer. *Hoffman*, 313 Or. at 470.

The insured has the burden of establishing that the assessed damages qualify as a covered loss under the terms of the policy. *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 349 Or. 117, 127 (2010). Once the insured has met this burden, the burden shifts to the insurer to show that the loss falls within the asserted exclusionary clause. *Id. See also Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or. App. 485, 509 (2007).

*A. McCoy As an Investment Adviser Representative under the Policy*

At the outset, the proper context must be identified for the court's application of the rules of construction previously set forth. At issue here is whether the insurance policy National Union issued to State Farm covers actions of the kind Garnishors allege McCoy engaged in and which caused the losses they suffered. Garnishors, both in their briefs and at oral argument, set their legal arguments mostly against the backdrop of their knowledge of McCoy's State Farm affiliation and their reliance on that affiliation, and McCoy's expertise gained from her State Farm work which they claim contributed to their decision to invest in Willamette. Summarized, at least a significant portion

of Garnishors' argument is that McCoy appeared to be acting at least in part in her capacity as a State Farm investment adviser. Garnishors argue further that McCoy used the Willamette presentations to solicit potential clients for her State Farm business.

Garnishors' focus on their circumstances and McCoy's status ignores the proper context for the court's determination of the coverage issue: what the contracting parties intended. Here, the contracting parties are National Union and State Farm; neither Garnishors nor McCoy were parties to the insurance contract. The connections Garnishors might have made between McCoy's statements and State Farm, the inferences Garnishors might have drawn about State Farm's involvement in or support of McCoy's presentations, and the representations McCoy might have made to Garnishors, are not relevant to the court's task of determining whether National Union and State Farm intended the insurance policy to cover actions of the type McCoy engaged in here. To determine whether the policy's terms are clear or ambiguous, the court must look at the policy from the perspective of National Union and State Farm as the contracting parties and in the context of the activities they intended the policy to cover and to not cover.

National Union argues that the Policy language covers only conduct engaged in while McCoy was acting as an IAR for State Farm and that McCoy was clearly not acting on behalf of State Farm when she promoted and recommended Willamette as an investment. Therefore, any damages arising from McCoy's involvement with Willamette are not a covered loss under the Policy. Garnishors argue that the Policy language is not so restrictive and that because McCoy 's involvement with Willamette placed her in a position to solicit Willamette investors as prospective State Farm clients,[2]

---

[2]The plaintiffs in the *Walston* state action assert a claim based on the negligence of the non-attorney defendants, which would include McCoy, in agreeing to permit Willamette to commingle funds. Garnishors do not argue that McCoy was acting as an IAR or on behalf of State Farm when

the damages arising from such involvement are covered under the Policy.

The language of the Policy obligates National Union to indemnify McCoy for all sums she becomes legally obligated to pay as a result of wrongful acts committed by her solely while acting in her capacity as an IAR. The Endorsement defines IAR as:

> an individual who has met all requirements necessary to be certified as a Certified Financial Planner by the Certified Financial Planners Board of Standards, maintained proper state registration as Investment Advisor Representative, and met other requirements as established by State Farm Mutual Automobile Insurance Company or any Affiliate thereof.

The clear, unambiguous meaning of this language is that McCoy's conduct is covered by the Policy only when McCoy is acting in accordance with these three criteria.

There is no dispute that McCoy was a properly certified financial planner or that she maintained proper state registrations. There is a dispute regarding the third requirement – that McCoy meet other requirements established by State Farm.

Garnishors argue that the only "other requirement" McCoy clearly had to meet was to enter into the IAR Agreement, which she did on July 6, 2006. Garnishors note that the IAR Agreement authorized McCoy "to act as an investment adviser representative of [State Farm] to provide the Advisory Services, exclusively through State Farm" and that under the IAR Agreement, McCoy had certain obligations, which included soliciting clients for State Farm, providing services to existing and prospective State Farm clients, and providing Advisory Services only in the states McCoy was licensed to do so. However, Garnishors ignore other requirements clearly imposed on McCoy as an IAR by the IAR Agreement.

Garnishors concede that in the first subsection of Article I of the IAR Agreement, which is

---

engaging in this alleged negligent conduct.

entitled "AUTHORIZATION", State Farm authorized McCoy to act as an IAR exclusively for State Farm. However, Garnishors fail to recognize the last subsection of Article I, in which McCoy acknowledges and agrees "that the solicitation or service provided by IAR to all clients is done on behalf of [State Farm], and that [State Farm] owns all rights to earnings and to the advisory business produced under this Agreement, including names and addresses, and that any medium containing this information, in whole or in part, is owned by [State Farm]." (Meiwes Decl. Ex. 2 at 1.). Garnishors apparently argue that as an IAR under the Policy, McCoy was obligated to meet the requirement set forth in the first subsection of Article I, but not the requirements set forth in the last subsection of the same Article.

Similarly, Garnishors acknowledge that McCoy is required to meet the criteria found in the first section of Article II, entitled "IAR'S OBLIGATIONS", which requires that she solicit clients for State Farm, provide services to existing and prospective State Farm clients, and do so only in states in which she is properly licensed, but not the additional requirements set forth in latter sections of the same Article. Section 2.10 of Article II provides that "[T]he fulfillment of this Agreement requires IAR's personal services and IAR will not directly or indirectly provide Advisory Services for any other company or agent, except in accordance with the terms of any written consent [State Farm] may give IAR." (Meiwes Decl. Ex. 2 at 5.) Section 2.5 provides that an IAR may not "participate in any speaking engagement regarding financial planning or the Advisory Services prior to informing the Advertising Manager of [State Farm] in writing and receiving written approval" or "[a]ccept gratuities, compensation, commissions or other remuneration in connection with Advisory Services from anyone other than [State Farm] or its agents without [State Farm's] prior written permission." (Meiwes Decl. Ex. 2 at 3-4.)

Section 2.4 provides, in pertinent part, that an "IAR will become familiar and will comply with all the requirements set forth in the Investment Advisor Representative Manual (the 'IAR Manual,' hereby incorporated into this Agreement by reference), as it may be amended from time to time or supplemented by compliance memoranda from [State Farm]." (Meiwes Decl. Ex. 2 at 2.) The IAR Manual in effect during the relevant period sets forth "those policies and procedures that pertain to your duties and responsibilities as an IAR" and cautions that "[c]ompliance with [State Farm's] policies and procedures is also important to you personally, because penalties for failure to comply with the policies and procedures outlined in this Manual may include regulatory sanctions, civil liability, criminal liability as well as disciplinary actions, sanctions or termination by [State Farm]." (Meiwes Decl. Ex. 1 at 3.) The IAR Manual requires State Farm IARs to "sign an acknowledgment that you have received a copy of this IAR Compliance Manual, acknowledge your responsibility to read and understand it before providing or attempting to provide financial planning services, and agree to abide by the policies and procedures in this Manual." (Meiwes Decl Ex. 1 at 3.)

The IAR Manual limited McCoy's services as an IAR to obtaining biographical and financial information from a State Farm client and using financial planning software provided by State Farm to generate a financial plan and general strategy recommendations designed to assist the State Farm client in meeting their financial goals and objectives. (Meiwes Decl. Ex. 1 at 14.) The IAR Manual specifically explained that:

> The financial planning software provided to you by [State Farm] will serve as the *exclusive* tool with which to create a client's Financial Plan. You are *not* authorized to act as an independent financial adviser by conducting your own research or by providing advice based on software, research, analysis, graphs, articles, reports, programs or other tools that are not provided by State Farm under the Program.

(Meiwes Decl. Ex. 1 at 14.)(emphasis in original.) Additionally, McCoy was never to state or imply that she recommend specific securities or investments in her capacity as an IAR for State Farm. (Meiwes Decl. Ex. 1 at 14, 16.) If a State Farm client elected to work with McCoy to implement the financial plan provided by McCoy, McCoy was obligated to remind the client that she was no longer providing financial planning advice on behalf of State Farm, but was recommending specific State Farm products as an insurance agent, a registered representative, or an agent authorized to sell State Farm Bank products. (Meiwes Decl. Ex. 1 at 21.) All of these requirements are consistent with those set forth in the Brochure, which is referred to in the IAR Agreement as the document providing the description of Advisory Services. In the Brochure, an IAR is limited to obtaining information from a client and preparing a financial plan using State Farm tools and information obtained from the client. (Meiwes Supp. Decl. Ex. 1 at 4-5.) The resulting financial plan recommends "general strategies that reflect basic financial planning considerations" but "does not include legal, accounting or tax advice." (Meiwes Supp. Decl. Ex. 1 at 5.) If an IAR offers specific investment recommendations, they must advise the client that they are no longer acting as an IAR but rather, an agent of State Farm, and the specific investments are limited to State Farm products. (Meiwes Supp. Decl. Ex. 1 at 6-7.)

The IAR Manual also advises that the "SEC regulates the content and use of all 'advertisements' used by investment advisers", and that "Advertisement" is broadly defined under the Advisers Act to include virtually any written communication directed to more than one person, including business cards, and provides strict rules related to advertisements used by IARs. (Meiwes Decl. Ex. 1 at 8.) The IAR Manual prohibits IARs from using sales materials and other communications used in connection with the provision of financial planning services other than

those provided by State Farm without obtaining approval from State Farm prior to disseminating the non-State Farm materials. (Meiwes Decl. Ex. 1 at 8.) The IAR Manual also requires prior written approval of the materials used in speaking engagements as follows:

> The text, script or outlines for speaking engagements related to financial planning and/or your provision of services as an IAR are treated as advertisements and must be approved *prior* to use. Before participating in any forum, you should provide the Program Manager in writing with:
>
> - the name of the organization to or venue at which you plan to speak;
> - the time and place of the event;
> - a description of the attendees;
> - the topic of the speaking engagement;
> - a written outline, script or text of the speech;
> - any literature to be used or distributed at the forum;
> - any honorarium.
>
> You should retain in your Advertising File these materials along with written approval and any other communications received from the Program Manager regarding such materials.

(Meiwes Decl. Ex. 1 at 13.) The IAR Manual further lists prohibited practices for IARs, such as:

> You may not exercise discretionary authority on behalf of a customer. Accordingly, you do not have authority to make independent investment decisions on behalf of any client.
>
> You may not ever state or imply that you recommend specific securities to customers in your capacity as an IAR of [State Farm]. All product placement and implementation of a Financial Plan is done in your capacity either as a registered representative of Broker-Dealer or as an insurance agent of State Farm Mutual Automobile Insurance Company, its subsidiaries and affiliates, or as a Bank-trained agent of State Farm Bank, F.S.B.
>
> In your capacity as an IAR you must put your clients' interest above your own. Since you are a fiduciary vis-a- vis your financial planning clients you must provide advice that is in their best interest. Accordingly, you may not recommend, advise, or imply that a client should ever take any action that is against their financial interest. Similarly, any investment advice that is provided must be based solely on a client's financial situation and goals and not on the amount of compensation you might receive if the client chose to purchase products from you as a State Farm agent or

registered representative in implementing the Financial Plan.

(Meiwes Decl. Ex. 1 at 16.) Similarly, the IAR Manual provides that IARs may not provide services or induce the purchase of financial services by any "manipulative, deceptive, or other fraudulent device or scheme" including nondisclosure or misstatement of material facts, examples of which include "exaggeration of potential gains, failure to disclose risks, guarantees of value and failure to disclose charges and expenses." (Meiwes Decl. Ex. 1 at 18.)

The Endorsement specifically provides that a State Farm agent is acting as an IAR and is entitled to coverage only when they meet "other requirements as established by State Farm." Garnishors concede that the IAR Agreement should be looked to as the source of the these "other requirements" but then argue that the court should construe the Endorsement to incorporate only the requirements found in the first subsection of Article I and the first three subsections of Article II of the IAR Agreement. In support of this argument, Garnishors note that the Endorsement requires an IAR to meet "other" requirements not "all" requirements established by State Farm and urge the court to construe the language of the endorsement restrictively, rather than broadly, by adopting only a few of the requirements identified in the IAR Agreement.

A reference made in one contract to another document for a specific purpose serves to incorporate the latter document into the contract for that specific purpose. *Nw. Pac. Indem. Co. v. Junction City Water Control Dist.*, 295 Or. 553, 558 (1983). Here, the Endorsement does not specifically reference the IAR Agreement as the document establishing the "other requirements" but it clearly contemplates the existence of a binding document which defines the relationship between State Farm and its IARs. The fact that: 1) the IAR Agreement is such a document; 2) both parties identify and rely on the IAR Agreement as the document contemplated by the Endorsement; and 3)

the IAR Agreement also includes the first two requirements identified in the Endorsement – that an IAR be certified as a Certified Financial Planner and maintain proper state registration[3] – make it reasonable to look to the IAR Agreement to provide the "other requirements" as well.

The question then becomes the proper construction of the term "other." In *Junction City*, the Oregon Supreme Court considered a contract which incorporated the "appropriate" provisions of a document referenced in a contract. The contract at issue was a permit entered into between the state and a municipal government entity for the construction of an irrigation canal which incorporated "appropriate" provisions from a state document relating to operations permits. The permit provided that the applicant was obligated to obtain the state document and determine which provisions were applicable. *Junction City*, 295 Or. at 555. The court rejected the argument made by Junction City that the determination of which provisions were "appropriate" should be left to it as the applicant explaining that "[t]o construe the criterion for incorporation in terms of the subjective interests of either party would be bound to make the application of such a term so unreasonable that no prudent person would enter into such a contract." *Id.* at 558-59. Instead, the court adopted the "objective theory of interpretation" which requires a court to give contract terms which serve as a standard of inclusion and are capable of more than one interpretation, such as "appropriate", the most reasonable interpretation under the totality of the circumstances. *Id.* at 559.

The holding in *Junction City* makes it evident that the court must view the IAR Agreement as a whole, in light of the purpose of the Policy and Endorsement, to determine what "other"

---

[3]Exhibit "A" to the IAR Agreement requires IAR to obtain and maintain in good standing any applicable state investment adviser representative registration and to remain in good standing with the Certified Financial Planner Board of Standards, Inc., during the term of the IAR Agreement. (Meiwes Decl Ex. 2 at 11.)

requirements must be met to qualify as an IAR under the terms of the Endorsement. In doing so, the court rejects Garnishors' attempt to pick and chose which requirements an IAR is obligated to meet to qualify as an IAR under the Endorsement.[4] However, even if the court were to limit the "other requirements" to those discussed by Garnishors, the IAR Agreement dictates that McCoy was to provide Advisory Services, as described in the Brochure, "exclusively through State Farm" and to solicit clients for State Farm's Advisory Services. McCoy's conduct with regard to Willamette and the Garnishors did not meet even these most basic requirements.

The Garnishors allege McCoy acted as an IAR in promoting the Willamette properties and that they relied on the negligent investment advice and recommendations offered by McCoy in deciding to invest in Willamette. McCoy was not acting "exclusively" through State Farm when she was promoting and recommending the Willamette investments. Assuming that McCoy's conduct in identifying herself as a State Farm agent in the materials attached to the PPM and in providing limited State Farm materials to the Garnishors at the investor meetings could be properly characterized as the solicitation of clients for State Farm, such solicitation was in conjunction with McCoy's promotion of Willamette and her offering advice and recommendations with regard to investments in Willamette. Therefore, at the least, McCoy was acting through both Willamette and State Farm, and not exclusively through State Farm, in interacting with and offering advice and recommendations to Willamette investors.

---

[4]The court notes that while Garnishors argue that only some sections of the IAR Agreement should be considered "requirements" McCoy was required to meet, they also rely on provisions found in Article III in support of their argument, supporting the conclusion that the IAR Agreement should considered and enforced as a whole, rather than on a piecemeal basis.

Additionally, the Advisory Services that McCoy was authorized to perform under the IAR Agreement were limited to those described in the Brochure. The Brochure described Advisory Services as obtaining information and providing a general financial plan to a State Farm client but did not include giving legal or tax advice or recommending specific investments. If an IAR offered specific investment advice, it was in their capacity as a State Farm agent, and an IAR, and the recommendations were limited to State Farm products. Not only was McCoy not acting exclusively through State Farm in recommending Willamette investments and the manner in which to make such investments, such conduct did not fall within the description of Advisory Services found in the Brochure. McCoy's relationship with Willamette and her interaction with Willamette investors did not meet the "other requirements" Garnishors concede she was obligated to meet – that she work exclusively through State Farm and that she provide Advisory Services as described in the Brochure. Accordingly, McCoy was not acting as an IAR under the terms of the Endorsement and, therefore, her conduct with regard to the Garnishors was not covered by the Policy.

This conclusion is supported by the additional requirements found in Articles I and II of the IAR Agreement, which contain the few obligations Garnishors concede are incorporated by the language of the Endorsement. These additional requirements make it clear that any solicitation or provision of services by an IAR is to be provided on behalf of State Farm, that State Farm is entitled to all earnings and information generated therefrom, that prior written consent from State Farm is required before an IAR participates in a speaking engagement regarding financial planning, directly or indirectly provides Advisory Services for anyone other than State Farm, or receives compensation in connection with Advisory Services from anyone other than State Farm. These requirements are consistent with those that Garnishors concede are applicable and set forth basic limitations on an

IAR's provision of Advisory Services pursuant to the IAR Agreement. Viewing the totality of the circumstances, as well as the purpose of the Endorsement, the Policy, and the IAR Agreement, which specifically incorporates the Brochure, the court finds that all requirements set forth in Articles I and II of the IAR Agreement are properly incorporated into the Endorsement as "other requirements" an IAR is required to meet to qualify as an IAR for the purposes of the Policy.

While McCoy was interacting with and advising Willamette investors, she was undeniably providing services on behalf of, as well as through, Willamette. State Farm did not receive any earnings or information generated from these alleged Advisory Services, even though McCoy represented to State Farm that she was being paid a salary for services rendered to Willamette. Finally, State Farm did not consent to McCoy's participation in Willamette's investor presentations, McCoy's provision of Advisory Services to Willamette, or McCoy's receipt of compensation from Willamette for her Advisory Services. McCoy failed to meet the other requirements established by State Farm in Article I and II of the IAR Agreement when offering investment advice and recommending that Garnishors invest in Willamette with funds obtained through mortgages on primary residences or Roth IRAs. Accordingly, McCoy was not acting as an IAR under the terms of the Endorsement when engaging in the negligent conduct supporting the Garnishors' limited judgments and is not entitled to indemnification under the Policy.

The IAR Manual, which is specifically incorporated by reference into the IAR Agreement in Article 2.4, provides additional limitations on an IAR's activities, all of which limitations are consistent with those found in the IAR Agreement and further support the general requirement that an IAR work exclusively through and for the benefit of State Farm. The IAR Manual sets forth requirements intended to ensure that State Farm IARs comply with federal and state requirements

and avoid regulatory sanctions, civil or criminal liability and possible disciplinary actions, including termination. These requirements are similar to the first two elements of the IAR definition found in the Endorsement which require an IAR to maintain proper registration in the state of Oregon and with the Certified Financial Planners Board of Standards, in other words, to meet the requirements necessary to legally act as an IAR in the state. It would be inconsistent to construe the language of the Endorsement to require an IAR to meet these legal requirements but not those requirements established by State Farm in the IAR Agreement and the IAR Manual to ensure that an State Farm IAR avoid violations of other legal obligations. Furthermore, it makes no sense that State Farm would intend to provide insurance for an IAR who violated the terms of the IAR Agreement and IAR Manual by providing Advisory Services through or for the benefit of another company when those same violations provide grounds for termination of the IAR. Accordingly, the court finds that the requirements set forth in the IAR Manual are consistent with those imposed on an IAR by the IAR Agreement and the Endorsement and properly qualify as "other requirements."

The IAR Manual advises State Farm IARs of the extreme limits on "advertisements" imposed by federal law and the broad definition given to "advertisements" under that same law. It then prohibits IARs from using sales materials other than those provided by State Farm without prior approval from State Farm. Consistent with the IAR Agreement, the IAR Manual requires an IAR to obtain written approval before participating in a speaking engagement regarding financial planning or investment advice, and then creates the additional requirement that the IAR obtain approval of the material to be used at the speaking engagement, including the text, script, or outline of the speech to be given. McCoy did not obtain prior approval from State Farm of her participation in the Willamette investor presentations, the content of the speech, or the materials disseminated at the

presentations.

The IAR Manual limited the services provided by an IAR to obtaining general biographical and financial information from a State Farm client and then using State Farm financial planning software as the "exclusive" tool to create a financial plan for the client. An IAR was not to conduct their own research or provide advice based on any independent research or tools not provided by State Farm. The IAR Manual specifically prohibited an IAR from recommending specific products or investments. If an IAR did wish to recommend an investment, they were to advise the client that they were acting as an agent of State Farm and were limited to offering only State Farm products. Here, it does not appear that McCoy spent sufficient time with any of the Garnishors to obtain the detailed biographical and financial information necessary to prepare a financial plan. McCoy did not use State Farm software to prepare a financial plan. She offered advice based on her independent research of appropriate vehicles for the Willamette investments, such as pulling equity from a primary residence or investing Roth IRA funds, and knowledge independently obtained about Willamette and its properties. She recommended Garnishors invest in Willamette, an act which exceeded her authorization as an IAR and violated her duties as a State Farm agent. By engaging in all of this conduct, McCoy failed to meet the other requirements imposed on her by State Farm in the IAR Manual.

In sum, the court finds that the most reasonable interpretation of the term "other" as used in the definition of IAR found in the Endorsement considering the totality of the circumstances is that the term should be viewed broadly to encompass the requirements established in the IAR Agreement, the Brochure, and the IAR Manual that are consistent with each other, the objectives of State Farm in creating reasonable limits on those it authorizes to act as IARs, and the intent of the parties with

regard to providing insurance coverage for State Farm agents acting on behalf of State Farm. While the court is convinced that even if it interpreted the term narrowly to include only the basic requirements identified in the IAR Agreement and the Brochure, McCoy's conduct in offering investment, legal, and tax advice to Garnishors while recommending that they invest in Willamette was not exclusively through State Farm nor did it constitute Advisory Services and, therefore, did not fall within the definition of IAR as set forth in the Endorsement. This conclusion is bolstered by the other requirements established by State Farm in the remaining portions of the IAR Agreement, Brochure, and IAR Manual which, when viewed as a whole and under the totality of circumstances, make it clear that, at the very least, an IAR must be acting exclusively through State Farm and for State Farm's benefit to be entitled to indemnification under the terms of the Policy. Accordingly, the court finds that McCoy was not acting as an IAR under the terms of the Endorsement when she engaged in the alleged wrongful conduct of negligently recommending that Garnishors invest in Willamette properties or the appropriate vehicle for making such investment, that such conduct is not covered by the Policy, and that National Union is entitled to summary judgment.

*B. McCoy Acting "Solely" as an IAR*

Even assuming that McCoy was soliciting clients for State Farm when she negligently recommended the Willamette investments to Garnishors and, therefore, could be viewed as an IAR as defined in the Endorsement, the damages awarded in the limited judgments must have arisen out of conduct committed by McCoy "solely" while acting in her capacity as an IAR to be a covered loss under the Policy. The parties agree that the term "solely" is generally accepted to mean to the exclusion of all other things. National Union then argues that this construction limits coverage under the Policy to conduct committed by McCoy when she was acting only as a State Farm IAR.

Garnishors contend that the phrase limits coverage to conduct committed by McCoy as an IAR regardless of whom she was working for at the time. Therefore, because McCoy was acting in her capacity as an IAR when making recommendations to Willamette investors, any damages caused by that conduct is a covered loss under the Policy. Reading the Policy and the incorporated documents as a whole, Garnishors' interpretation of the Policy language is not reasonable.

The specific language at issue provides that National Union will pay on behalf of McCoy damages "arising out of any action or alleged Wrongful Conduct committed by the Investment Adviser Representative solely while acting in her/her capacity as such." (Clapham Decl. Ex. 13 at 22.) Garnishors argue that National Union's proposed construction of this language is not plausible when considered in light of other coverage provisions. For example, Garnishors note that the Registered Representative Endorsement specifically limits coverage for "Wrongful Acts committed by the Registered Representative solely in respect to servicing, selling, or attempting to sell variable life insurance, variable annuities and/or mutual funds through State Farm. . . ." (Clapham Decl. Ex. 13 at 19.) They then argue that had the parties wanted to limit coverage for IARs to conduct engaged in solely on behalf of State Farm, they could have done so.

The court must construe a contract to effectuate the objectively reasonable intentions of the parties and, to do so, the court should look at the contract as a whole and the circumstances surrounding the making of the contract. Here, State Farm purchased the Policy from National Union to protect it, and its agents, from liability resulting from services performed on behalf of, and to benefit, State Farm. In a number of places, such as in the Registered Representative Endorsement, the parties specifically limit the Policy to services rendered through State Farm. In the State Farm Financial Service Endorsement, coverage was limited to damages arising out of the placement of

business with State Farm when the agent is acting in their capacity "as a Bank agent or an Insurance Agent for [State Farm]". (Clapham Decl. Ex. 13 at 16.) Similarly, in the body of the Policy, "Insured" is defined as a licensed insurance or general agent under contract with State Farm "while acting within the scope of his duties as such." (Clapham Decl. Ex. 13 at 5.)

The court is convinced that the parties to the Policy intended to limit coverage to damages arising from conduct of the insureds while acting in their capacity as an agent of State Farm. This intent is more than reasonable. It would be objectively unreasonable to construe the language of the Policy, and the Endorsement, to provide coverage for IARs no matter who they are representing or benefitting. In that event, State Farm would bear the financial burden of purchasing insurance for IARs who promote and sell other investments while receiving none of the benefit for such activity. Furthermore, the specific language of the Endorsement limits coverage for IARs only when they are acting solely in their capacity as an IAR and then provides a specific definition for IAR that requires those IARs to meet other requirements established by State Farm. The requirements, which are set forth in the IAR Agreement and Brochure and are discussed above, clearly restrict the IARs authority to providing Advisory Services exclusively through and on behalf of State Farm.

Garnishors also argue that limiting the coverage under the Policy to acts committed solely while acting as a State Farm IAR is not plausible when read in conjunction with the Registered Representative Endorsement. Garnishors rely on the Policy definition of Registered Representative as someone who services, sells, or attempts to sell various securities on behalf of State Farm and the state statutory definition of an IAR as a individual who "makes recommendations or otherwise renders advice regarding securities",[5] and then contend that because a Registered Representative is

[5]OR. REV. STAT. 59.015(8)(a)(A)(i) (2011)

acting as both a Registered Representative and an IAR most of the time, the obligation to pay under the Policy becomes illusory and, therefore, not plausible. This argument is not convincing.

A comparison of the definitions of Registered Representative and IAR found in the Policy, Endorsements, and incorporated documents, make it clear that State Farm and National Union view the services rendered in these capacities as mutually exclusive. A Registered Representative engages in the selling and servicing of securities or other investments while an IAR merely compiles and analyzes information using State Farm procedures and provides the client with a general financial plan. An IAR is not authorized to give legal or tax advice, or recommend specific investments. An IAR who gives investments advice or sells securities must advise the client beforehand that they are no longer acting as an IAR, but rather as a Registered Representative or other agent of State Farm. The Brochure, which is incorporated into the IAR Agreement and sets forth the description of an IAR, informs State Farm clients that IARs "who recommend the purchase of particular products after the financial planning process is completed will inform you that any such recommendation is made not as an Investment Adviser Representative of State Farm Investment Management, but instead as an agent of one or more of the other State Farm companies." Similarly, the IAR Manaul, which is also incorporated into the IAR Agreement, requires the IAR to:

> Remind the customer that if a customer decides to proceed with you to implement the Financial Plan, you are no longer providing financial planning advice on behalf of the Firm. Once you reach the implementation phase, you are recommending the purchase of products as an insurance agent, a registered representative of the Broker-Dealer or an agent authorized to sell State Farm Bank products.

(Meiwes Decl. Ex. 1 at 21.) Viewing the definitions of Registered Representative and IAR used in the Policy for the purpose of determining coverage, it is clear that under no circumstances will the duties of a Registered Representative and an IAR overlap. Accordingly, a State Farm agent will

never act as both a Registered Representative and IAR in recommending and selling securities, and Garnishors' argument to the contrary is without merit.

Finally, the cases relied on by Garnishors in support of their argument that the Policy should be construed broadly to cover all activities of an IAR regardless of for whom they are working at the time are easily distinguishable from the case at hand. In *T.M v. Exec. Risk Indem. Inc.*, 59 P.3d 721 (Wyo. 2003), the court considered whether a professional liability insurance policy purchased by a psychologist covered negligence claims against her based on her husband's sexual abuse of their foster children. The policy covered wrongful acts solely in the performance, or failure to perform, professional services as a psychologist. *Id.* at 725. The policy was purchased by the psychologist and did not contain a definition of "psychologist." *Id.* at 723, 725. In the absence of language in the policy limiting coverage to those situations in which the psychologist was providing formal services, the court found the term "solely" to be ambiguous and construed the policy language broadly to cover the failure to perform psychological services for the foster children. *Id.* at 726.

Here, the Policy specifically defines IAR as an agent who performs Advisory Services exclusively through State Farm, which is the limiting language missing in *T.M.* Also, the Policy was purchased by State Farm, not McCoy, as was the case in *T.M.* National Union concedes that had McCoy purchased her own professional liability policy, the damages awarded to the Garnishors may well have been covered under that policy. But here, State Farm purchased the Policy and its intent, not McCoy's, is the relevant focus. State Farm chose to defined the IARs' scope of duties and obtained insurance coverage, in part, based on that definition.

In *Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742 (5th Cir. 2000), the treasurer of the plaintiff convinced plaintiff to invest a large sum of money in small factoring

company in which he held a 49% ownership interest, but failed to disclose the conflict. *Id.* at 744. The company failed and the plaintiff lost its investment. *Id.* Plaintiff obtained a judgment against the treasurer for breach of both a duty of care and a duty of loyalty and then sought to recover the damages awarded from an insurance policy purchased to insure against wrongful acts committed by officers of the school. *Id.* at 744-45. The policy provided coverage for an act committed solely in the performance of duties for the plaintiff. *Id.* at 750. The court found the term "solely" to be ambiguous in that it could plausibly mean that the wrongdoer had no interest in a transaction other than as a school official or that the wrongful conduct occurred while performing duties for the school and construed the ambiguity in favor of the insured. *Id.* at 750-51. The court then relied on the fact that the treasurer was acting within his duties as a treasurer to find that coverage existed under the policy. *Id.* at 751. ("Cosby's job as treasurer was to manage and make investments with Jarvis' money, and that is what he did in this case.").

Here, the definition of IAR, as well as the clear intent of the parties found in the language of the Policy as a whole, requires a different result. The parties' objectively reasonable intent was to provide insurance for State Farm agents when they were acting only behalf of, and benefitting, State Farm. McCoy's conduct in promoting and selling Willamette investments was not on behalf of, or for the benefit of, State Farm. Also, the Endorsement and incorporated documents limit IARs' authorized conduct to obtaining information and providing a general financial plan. Once McCoy offered recommendations to the Garnishors on the Willamette investments as the best vehicle to invest with, McCoy exceeded her authority as an IAR and took herself out of coverage under the express terms of the Endorsement.

Finally, in *Berry & Murphy, P.C. v. Carolina Casualty Ins. Co.*, 586 F.3d 803, 814 (10th Cir.

2009), the Tenth Circuit considered the definition of "insured" in the context of a policy requirement that a claim must be first made to an "insured" during the policy period. In the policy, "insured" was defined, in part, as "any individual or professional corporation who was a partner, officer, director, stockholder or employee of the Named Insured or Predecessor Firm, but solely while acting with the scope of their duties on behalf of the Named Insured or Predecessor Firm." *Id.* The court explained that to give effect to the inclusion of former employees in the definition of "insured", the clause:

> cannot mean that an individual is an insured only while acting on behalf of the named insured, but must mean that an individual is an insured only if the claim being made is related to that individual's duties on behalf of the named insured. Otherwise, no former employee of the named insured could ever be an 'insured.'"

*Id.* at 814-15.

While *Berry & Murphy* is distinguishable from this case based on the issue and language before the court, the construction of the relevant phrase is actually consistent with the construction urged by National Union, rather than Garnishors, in this instance. Garnishors' claims are based on McCoy's conduct in recommending specific investments and ways to invest in Willamette, not on Advisory Services being performed on behalf of and through State Farm. Consequently, under the reasoning of the Tenth Circuit in *Berry & Murphy*, Garnishors' claims, which are not related to McCoy's duties on behalf of State Farm, are not covered by the Policy.

Viewing the Policy, the Endorsement, and the incorporated documents, as well as the parties' objectively reasonable intent, the court finds that the proper construction of the phrase "arising out of any action or alleged Wrongful Conduct committed by the Investment Adviser Representative solely while acting in her/her capacity as such" means that an IAR must be acting exclusively on behalf of, and for the benefit of, State Farm to be covered by the Policy. McCoy was acting on

behalf of, and for Willamette in promoting and recommending that Garnishors invest in Willamette. Even if, as Garnishors argue, McCoy was also soliciting potential clients for her State Farm business, that secondary purpose does not change that McCoy was working for Willamette at all times in question, and primarily so. Consequently, the damages awarded Garnishors in the limited judgments are not covered losses under the Policy and National Union is entitled to summary judgment on Garnishors' claims.

II. Policy Exclusions and Causal Connection Arguments

The court has found that McCoy's conduct in promoting and recommending Willamette investments, as well as the appropriate manner in which to invest, did not fall within the definition of IAR found in the Endorsement as the conduct was not provided exclusively through State Farm, as required by the IAR Agreement, and did not constitute Advisory Services, as described in the Brochure. Additionally, the court construes the language "solely" while acting in McCoy's capacity as an IAR to be limited by the parties intent, the language of the Policy as a whole, and the definition of IAR found in the Endorsement and the incorporated documents, to conduct related to State Farm, not conduct of an IAR as generally defined by statute. Accordingly, the damages awarded to the Garnishors in the limited judgments, which are based on the negligence of McCoy in recommending Willamette investments and allowing the commingling of funds, are not covered losses under the Policy. Because the damages are not covered under the Policy and National Union is entitled to summary judgment on this ground, the alternative arguments that the negligent conduct falls within a number of exclusionary clauses or that certain investors have not established the requisite causal connection between McCoy's investment advice and their decision to invest are moot and will not be addressed.

*Conclusion*

National Union's motion to strike the declarations of Froydis Tyburczy and Jaysen Daskalos, found in its reply memorandum, is GRANTED. National Union's motions (# 71, #74, and #56) for summary judgment are also GRANTED.

DATED this 6th day of June, 2012.

JOHN V. ACOSTA
United States Magistrate Judge